**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4636**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROBERT J. FREEMAN, a/k/a Dr. Shine,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, District Judge. (8:10-cr-00424-RWT-2)

Argued: December 10, 2013          Decided: January 17, 2014

Before DUNCAN, WYNN, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, in which Judge Duncan and Judge Wynn joined.

**ARGUED**: Nancy Susanne Forster, KADISH, FORSTER & FASTOVSKY, Baltimore, Maryland, for Appellant. Thomas Patrick Windom, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF**: Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

THACKER, Circuit Judge:

Robert J. Freeman, a/k/a "Dr. Shine" ("Appellant"), appeals the order of the district court directing him to pay $631,050.52 in restitution to four individuals (the "purported victims") as part of his sentence for obstructing federal bankruptcy proceedings. On appeal, Appellant argues the district court erred because the purported victims to whom he was ordered to pay restitution are not victims of the offense to which he pled guilty. Rather, he contends, the purported victims suffered losses when Appellant caused them to take out significant loans for the benefit of his church -- conduct with which he was not charged or convicted. The Government contends that the purported victims are entitled to restitution because Appellant's untruthfulness during his bankruptcy proceedings rendered them otherwise unable to be repaid for their loans and/or recoup their ensuing losses.

We hold that, because the specific conduct that is the basis for Appellant's conviction did not cause the purported victims' losses, they are not entitled to restitution. Therefore, we reverse the judgment of the district court to the extent it orders restitution. Given that the district court ordered restitution in lieu of a fine, we remand this matter so that it may consider whether or not to impose a fine.

2

I.

A.

On November 10, 2010, Appellant was charged by a superseding indictment with two counts of obstruction of an official proceeding, two counts of making false statements in a bankruptcy proceeding, and one count of providing false records in a bankruptcy proceeding. On July 18, 2011, Appellant pled guilty to one count of obstructing an official proceeding, pursuant to 18 U.S.C. § 1512(c)(2). The plea agreement generally stated, "This Court may . . . order [Appellant] to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664," but it did not evince an agreement between Appellant and the Government with regard to restitution. J.A. 24.[1]

The statement of facts addendum to the plea agreement (the "Statement of Facts") provided the following: Appellant purported to be a minister, and between 1991 and 2003 he incorporated Save the Seed Ministry, Inc., Save the Seed International Church, and Seed Faith International Church. He served as pastor and leader of all three. Shortly after forming these entities, Appellant began using church funds to "accumulate substantial assets, including a $1.75 million

_____

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

residence and luxury automobiles, in the names of members of the church." J.A. 30. For example, Appellant caused one church member to buy a Bentley Arnage and lease a Maybach luxury automobile, valuing more than $340,000 combined, and another to buy a $1.75 million home, in which Appellant and other church members lived. The Government contends that for each of these purchases, the church members understood that although their names were on the loan documents, Appellant and/or the church would take care of the appropriate payments.

By October 2005, Appellant and his spouse owed debts in their names totaling more than $1.3 million, "including $846,000 in back rent; more than $87,000 in lease payments on a jet airplane; more than $160,000 for payments on musical instruments; and $220,000 in loan payments on a bus." J.A. 31.

Appellant and his spouse filed for Chapter 13 bankruptcy on October 14, 2005. In addition to the information recounted above, the Statement of Facts also set forth the following ways in which Appellant obstructed the bankruptcy proceedings:

- He reported no real property in which he had any "legal, equitable or future interest."

- He reported no "personal property of whatever kind, including property being held for the debtor by someone else."

- He reported no "property owned by another that the debtor held or controlled."

4

- He reported that his "occupation" was "consultant of a maintenance company."

- He reported receiving no gross income from employment, trade, or profession, or from operation of a business in 2003 and 2004, and only receiving $4,000 for 2005. He reported receiving no other income during the two years immediately preceding the filing of bankruptcy.

J.A. 31-32 (emphases supplied).

On December 2, 2005, Appellant attended a creditors' meeting. At that meeting, he testified that he and his spouse rented a house at a certain address, which was not true. He further testified, "we lost our ministry, went out of business," but "[i]n fact, Freeman had not lost his ministry, which had not gone out of business." J.A. 32. Appellant also presented to the trustee seven documents purporting to be earning statements from a business called Automatic Data Processing, Inc., but "in fact, the statements were wholly fictitious." Id.

On December 12, 2005, Appellant's Chapter 13 petition was converted to a Chapter 7 petition, and the bankruptcy court granted the Chapter 7 petition on March 8, 2006, resulting in the discharge of "hundreds of thousands of dollars in debt[]." J.A. 32. Appellant was neither charged with nor convicted of any conspiracy or scheme to defraud the purported victims.

5

B.

The Presentence Report ("PSR"), which was filed August 29, 2011, did not recommend restitution. To the contrary, it stated, "The government has advised there is no restitution or forfeiture in this case." J.A. 235. The PSR also stated, "There are no specific victims in this case. The defendant's actions, however, jeopardized the integrity of the United States Bankruptcy Court." Id. at 228. The Government filed no objections to the PSR.

Nonetheless, on June 21, 2012, the Government submitted to the district court a number of victim impact statements, including statements from the purported victims. About a month later, on July 16, 2012, the Government filed its sentencing memorandum, requesting for the first time on the record that the court order Appellant to pay restitution as part of his sentence, theorizing:

> The church members who acted as nominees to purchase luxury automobiles and a mansion for the defendant . . . suffered significant losses as a result of the defendant causing them to purchase expensive assets under the mistaken belief that the defendant, through the church, would pay for the assets. As a result of the defendant's failure to pay for the assets purchased by the nominee victims, several of the nominee victims suffered harm to their credit scores, lost properties they had owned, and/or had to file bankruptcy.

J.A. 85. On the day of sentencing, July 30, 2012, the Government filed a more specific request for restitution, for

6

the first time mentioning the victims' names in a public court filing.[2]  The request stated,

> The government requests that the defendant be ordered to pay the following amounts:
>
> <u>Brenton and Wendy Cloud</u> [(collectively, the "Clouds")]: $301,050.52.  Mr. and Mrs. Cloud owned their residence prior to serving as nominees for the defendant.  As a result of serving as nominees for the defendant, however, Mr. and Mrs. Cloud incurred significant debts.  Ultimately, the Clouds had to sell their residence at a short sale to pay the debts they had incurred on behalf of the defendant.  $301,050.52 represents the equity that the Clouds lost as a result of having to sell their residence in order to repay the debts they incurred as nominees for the defendant.
>
> <u>Cecil Dixon</u>: $230,000. Mr. Dixon was employed as an investigator with WMATA [Washington Metropolitan Area Transit Authority] prior to serving as a nominee for the defendant.  As an investigator, Mr. Dixon earned $76,000 per year.  After serving as a nominee for the defendant, Mr. Dixon incurred significant debts that ultimately forced him to resign from his job.  Although Mr. Dixon is currently employed, he now earns only $30,000 per year.  $230,000 represents five years' worth of the wages Mr. Dixon lost as a result of being victimized by the defendant.

---

[2] The victim impact statements were not publicly filed, and it does not appear that Appellant was aware of them until July 2012.  The Government cannot provide an exact date upon which Appellant received the supplemental restitution information.  It submits, however, that Appellant "must have been aware of this information by July 27, 2012, . . . because the defendant on that date filed an 'Opposition Memo in Response to Request for Resitution [sic] Order' opposing the government's requests as to the specific victims and amounts."  Appellee's Br. 6 n.2 (citing J.A. 101).  Thus, while it may be true that Appellant knew the names and information regarding the specific purported victims before the day of sentencing, it was certainly not long before.

> Scott Washel: $100,000. Mr. Washel owned his residence prior to serving as a nominee for the defendant. As a result of serving as a nominee for the defendant, however, Mr. Washel incurred significant debts. Ultimately, Mr. Washel had to sell his residence to pay the debts he had incurred on behalf of the defendant. $100,000 represents the equity that Mr. Washel lost as a result of having to sell his residence in order to repay the debts he incurred as a nominee for the defendant.[3]

Id. at 106-07. The Government did not cite a statutory basis for its restitution request.

At sentencing on July 30, 2012, the district court calculated Appellant's offense level at 16 and criminal history category at I. His Sentencing Guideline range was, thus, 21-27 months. The court sentenced Appellant to 27 months. Notably, the court also ordered three years of supervised release and imposed total restitution of $631,050.52 to the purported victims, in the exact amounts requested by the Government. The court stated, "I'll impose the mandatory and standard conditions of supervision, with the additional provision[] . . . that [Appellant] make payments . . . to the clerk of this court for distribution to the victims in the monthly amount of at least $750 a month." J.A. 211. The district court did not, however,

---

[3] On December 5, 2013, the Government filed a letter with this court conceding that the restitution amounts requested and ultimately awarded to three of the four purported victims -- that is, the Clouds and Washel -- are incorrect. Because we decide herein that none of the purported victims are entitled to restitution, however, this matter is moot.

8

cite a statutory basis for the restitution award.  The court also noted that no fine would be imposed because of the restitution award.[4]  Appellant timely appealed, challenging only the legality of the order of restitution.

## II.

We review a district court's restitution order for abuse of discretion.  See United States v. Leftwich, 628 F.3d 665, 667 (4th Cir. 2010).  "Federal courts do not have the inherent authority to order restitution, but must rely on a statutory source to do so."  United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (internal quotation marks and alteration omitted).  Indeed, "[a] restitution order that exceeds the authority of the statutory source is no less illegal than a sentence of imprisonment that exceeds the statutory maximum."  Id. (internal quotation marks omitted).  Discretion in ordering restitution "is circumscribed by the procedural and substantive protections of the statute authorizing restitution."  Leftwich, 628 F.3d at 667 (internal quotation marks omitted).

---

[4] The maximum fine for the offense to which Appellant pled guilty was $250,000.  See 18 U.S.C. § 3571(b)(3).

9

III.

A.

We must first address which statutory provision is implicated in the district court's order of restitution, as the district court did not mention a statute in its sentencing colloquy or judgment order.[5] There are four possible statutory provisions which could be implicated: the Victim and Witness Protection Act of 1982 (the "VWPA"), 18 U.S.C. § 3663; the Mandatory Victims' Restitution Act (the "MVRA"), id. § 3663A; and the provisions governing restitution imposed as a condition of probation, id. § 3563(b)(2), and supervised release, id. § 3583(d).

After a close review of the sentencing transcript and judgment documents, it becomes clear that the district court imposed restitution as a condition of supervised release. At the sentencing hearing, the district court first announced that it would impose restitution in lieu of a fine when discussing the factors set forth in 18 U.S.C. § 3553(a). The court stated,

---

[5] We regret that this extra wrinkle was added to this appeal and remind the Government and sentencing judges to clearly set forth the statutory provisions they rely upon in requesting and imposing restitution. See United States v. Stuver, 845 F.2d 73, 75 (4th Cir. 1988) (Sentencing judges should "specify in the record the precise statute under which they act in imposing restitution" to ensure "effective appellate review of restitution orders.").

10

Finally, I'm required to consider the need to provide restitution to any victims of the offense. In this case I think a restitution order is appropriate.

. . .

There is no question that loose money lending practices in this case helped this crime get committed, but the essence of the crime was to take unwitting people relying upon the notion of doing things for their church to go out and incur substantial debts when money was easy to get and provide those assets directly for the benefit principally of the defendant on trial before me. . . .

Accordingly, I am going to enter -- in lieu of a fine, I'm going to enter an order of restitution to the victims identified in the Government's sentencing -- restitution memorandum that was filed before the Court.

J.A. 208-09. The court went on to impose the sentence of 27 months, but returned to the specifics of the restitution award when discussing the supervised release conditions. The court stated,

I'm going to impose a sentence of 27 months of incarceration.

I will impose a period of supervised release of three years.

I'll impose the mandatory and standard conditions of supervision, with the additional provision[] . . . that [Appellant] make payments . . . to the clerk of this court for distribution to the victims in the monthly amount of at least $750 a month. That is within his ability to pay as reflected by the financial statement attached to the -- or which is part of [the PSR].

. . .

11

> I will not impose any fine, in light of the large restitution obligation that I'll be imposing as I previously indicated.

Id. at 211-12.

Furthermore, the judgment order specifies the restitution amount under the section heading "SUPERVISED RELEASE ADDITIONAL CONDITIONS." J.A. 219. The Schedule of Payments also provides, "The restitution in the amount of $631,050.52 shall be paid in monthly installments of at least $750.00 per month over the period of 3 year(s) to commence when the defendant is placed on supervised release." Id. at 221 (emphasis supplied). Reading the judgment order and the transcript together, it is clear restitution was imposed as a condition of supervised release. Therefore, we must view the arguments of the parties through the lens of 18 U.S.C. § 3583(d).[6]

---

[6] The Government argues Appellant waived this argument for failure to address 18 U.S.C. § 3583(d) in his opening brief. It is true that Appellant did not mention § 3583(d) in his opening brief; however, he did present arguments related to interpretation of the phrase "of the offense," which is the main issue in this appeal. Thus, Appellant's arguments in his opening brief, albeit couched in terms of the VWPA and MVRA, are certainly pertinent to the outcome of this appeal. Further, Appellant can hardly be faulted for failing to cite the specific statute under which restitution was imposed, when neither the Government nor the district court did so in connection with the sentencing proceedings.

B.

Ascertaining the meaning and context of 18 U.S.C. § 3583(d) involves applying several cross-references. Section 3583(d) itself provides, "The court may order, as a further condition of supervised release, . . . any condition set forth as a discretionary condition of probation in section 3563(b) . . . ." 18 U.S.C. § 3583(d). The reference to § 3563(b) invokes the statute allowing the imposition of restitution as a condition of probation, which states,

> The court may provide, as [a] further condition[] of a sentence of probation . . . that the defendant . . .
>
>> (2) make restitution to a victim <u>of the offense</u> under section 3556 (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A)).

Id. § 3563(b)(2) (emphasis supplied). In turn, 18 U.S.C. § 3556 provides, "The court, in imposing a sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A [the MVRA], and may order restitution in accordance with section 3663 [the VWPA]." Id. § 3556. Therefore, by operation of § 3556, an order of restitution imposed as a condition of supervised release shall

be made "in accordance with" VWPA and MVRA, but not subject to "the limitation" therein.[7]

C.

Having discussed the applicable statutes, we now turn to the crux of this appeal:  whether the purported victims are victims "of the offense" for the purposes of 18 U.S.C. § 3563(b).

---

[7] The "limitation" mentioned in § 3563(b) is not specific. The VWPA subsection referenced as a "limitation" discusses the type of offenses for which restitution may be awarded, see 18 U.S.C. § 3663(a)(1)(A) (providing that a court may order restitution to a victim of a Title 18 offense, certain Controlled Substances Act offenses, and other federal offenses involving aircraft piracy and transportation of hazardous materials), and the type of harm a victim must experience, see id. § 3663(a)(2) (defining victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern").   Likewise, the MVRA mandates restitution only "for convictions of, or plea agreements relating to charges for, any offense . . . that is . . . a crime of violence . . . ; an offense against property under this title . . . including any offense committed by fraud or deceit; an offense . . . relating to tampering with consumer products; or an offense . . . relating to theft of medical products."  Id. § 3663A(c)(1)(A)(i) – (iv).  Because we decide that the purported victims are not victims of Appellant's offense of conviction, we need not address these potential limitations here.

14

1.

We first discuss whether the statute requires the purported victims to be victims only of the offense of conviction. As explained below, we conclude it does.

In 1990, the Supreme Court held, "the language and structure of [the VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by <u>the specific conduct that is the basis of the offense of conviction</u>." <u>Hughey v. United States</u>, 495 U.S. 411, 413 (1990) (emphasis supplied). This concept was later extended to cases such as this, in which the restitution was ordered as a condition of supervised release. <u>See, e.g.</u>, <u>United States v. Batson</u>, 608 F.3d 630, 637 (9th Cir. 2010) ("We now join our sister circuits in holding that an award of restitution ordered as a condition of supervised release can compensate 'only for the loss caused by <u>the specific conduct that is the basis of the offense of conviction</u>,' so long as that offense does not involve an element of scheme, conspiracy or pattern of criminal activity." (citing <u>Hughey</u>, 495 U.S. at 413) (emphasis supplied)); <u>United States v. Varrone</u>, 554 F.3d 327, 334 (2d Cir. 2009) ("We now join our sister circuits in concluding that <u>Hughey</u>'s construction of the VWPA is applicable to the restitution provision of the supervised release statute. We hold that restitution can be ordered as a condition of supervised release under 18 U.S.C.

15

§§ 3583(d), 3563(b)(2) only to compensate for losses caused by the specific conduct that is the basis for the offense of conviction."); United States v. Frith, 461 F.3d 914, 920 (7th Cir. 2006); United States v. Romines, 204 F.3d 1067, 1069 (11th Cir. 2000) (per curiam); Gall v. United States, 21 F.3d 107, 110 (6th Cir. 1994).

In the face of this overwhelming authority, the Government essentially conceded at oral argument that in order to collect restitution, the purported victims must be victims of the offense for which Appellant was convicted. See Oral Argument at 25:16–25:24, United States v. Freeman, No. 12-4636 (Dec. 10, 2013), available at http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments ("The Government is only arguing that the basis of the restitution award was based on the offense of conviction, not on the relevant conduct."). We nonetheless pause to consider this issue, as it is one we have not yet addressed in a published opinion.[8]

Persuaded by our sister circuits' reasoning, we join them in holding that awards of restitution ordered as a

---

[8] We have addressed the issue in an unpublished opinion. See United States v. Rosser, No. 91-5856, 1992 WL 113384, at *1 (4th Cir. May 29, 1992) (unpublished per curiam) (vacating restitution award imposed as a condition of supervised release because "the district court failed to limit restitution to the amount of loss the Government sustained as a result of the offense for which Rosser was convicted").

16

condition of supervised release must compensate "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey, 495 U.S. at 413.

The plain reading of the applicable statutory language compels this result. Section 3563(b) states that a district court may, as a condition of probation or supervised release, "make restitution to a victim of the offense." 18 U.S.C. § 3563(b)(2) (emphasis supplied). Further, restitution as a condition of probation (and supervised release) is to be ordered "under section 3556." Id. Section 3556 refers to orders of restitution pursuant to the VWPA and the MVRA, which provide, "[t]he court, when sentencing a defendant convicted of an offense [under listed titles or statutes] may order . . . restitution to any victim of such offense," id. § 3663(a)(1)(A), and "when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense," id. § 3663A(a)(1) (emphases supplied); see also Batson, 608 F.3d at 636.

As Batson explains, "The natural reading of these provisions is that restitution is authorized for the offense of conviction and not for other related offenses of which the defendant was not convicted." Batson, 608 F.3d at 636. Indeed, these statutes do not allow restitution for "relevant conduct,"

17

"a related offense," or a "factually relevant offense," but rather, "the offense," which can only be read to mean the offense of conviction. See Hughey, 495 U.S. at 418 ("[H]ad Congress intended to permit a victim to recover for losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction, Congress would likely have chosen language other than 'the offense,' which refers without question to the offense of conviction."). To hold otherwise would be to improperly read the words "of the offense" out of the statute. See United States v. Nordic Vill., Inc., 503 U.S. 30, 36 (1992) (declining to adopt a construction that would violate the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

In sum, regardless of whether restitution is ordered pursuant to the VWPA, the MVRA, or as a condition of supervised release or probation, the alleged victims must be victims of the offense of conviction. See United States v. Newsome, 322 F.3d 328, 341 (4th Cir. 2003) ("[T]he focus of the court in applying the MVRA must be on the losses to the victim caused by the offense." (emphasis supplied)); id. ("[I]t is the 'offense of conviction,' not the 'relevant conduct,' that must be the cause of losses attributable as restitutionary liability."); United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996) ("For a person

18

to be considered a victim under the [VWPA], the act that harms the individual must be . . . conduct underlying an element of the <u>offense of conviction</u> . . . ." (emphasis supplied)).[9]

2.

Therefore, we must next address whether the purported victims' losses were "caused by the specific conduct that is the basis of" the defendant's offense of conviction. <u>Hughey</u>, 495 U.S. at 413. The Government bears the burden of showing the causal connection and the amount of the loss. <u>See</u> 18 U.S.C. § 3664(e) ("The burden of demonstrating the amount of the loss sustained by a victim <u>as a result of the offense</u> shall be on the attorney for the Government." (emphasis supplied)); <u>see also</u> <u>United States v. Kieffer</u>, 681 F.3d 1143, 1171 (11th Cir. 2012) (demonstrating that it is the Government's burden to prove alleged victims are "victims of Defendant's criminal conduct."

---

[9] This court has recognized that the act that harms the alleged victim could also be "an act taken in furtherance of a scheme, conspiracy, or pattern of criminal activity that is specifically included as an element of the offense of conviction." <u>Blake</u>, 81 F.3d at 506; <u>see also</u> <u>United States v. Henoud</u>, 81 F.3d 484, 489 (4th Cir. 1996) (affirming a restitution order where the defendant was convicted of a criminal scheme and "the district court had the authority to order restitution for the losses by the entire fraud scheme" (internal quotation marks omitted)). Given that Appellant was not convicted of a scheme, conspiracy, or pattern, we are not presented with such a situation in this case.

19

(internal quotation marks omitted)). We conclude that the Government fell far short of meeting its burden in this matter.

a.

This court has overturned restitution awards in which the Government could not show the requisite causal connection between the specific conduct underlying the offense of conviction and the victims' losses. For example, in United States v. Broughton-Jones, 71 F.3d 1143 (4th Cir. 1999), the defendant was indicted on four counts of perjury and one count of wire fraud in connection with a fraudulent brokerage scheme. See id. at 1145. Broughton-Jones pled guilty to one count of perjury, based upon false testimony she provided to a federal grand jury. At sentencing, the district court ordered her to pay restitution in the amount of $25,000, the amount of an advance payment she obtained from a client under false pretenses, which served as the basis for the wire fraud charge. See id.

Pursuant to Hughey, we held Broughton-Jones did not have to pay restitution to her unwitting client because the restitution order did not "compensate[] a victim of Broughton-Jones's perjury for some loss caused by that offense." Broughton-Jones, 71 F.3d at 1148 (emphasis supplied). After examining the "specific conduct" underlying the conviction of grand jury perjury, we held, "[a]lthough there is a factual

20

connection between Broughton-Jones's perjury and her alleged financing scheme, that connection is legally irrelevant." Id. at 1149. Therefore, we vacated the entire sentence and remanded for resentencing.

In United States v. Blake, 81 F.3d 498 (4th Cir. 1996), we again concluded that alleged victims' losses were not caused by a defendant's offense of conviction and vacated the restitution award to those individuals. In that case, Blake pled guilty to using unauthorized access devices (i.e., stolen credit cards), and the district court ordered him to pay restitution to the owners of the credit cards. See id. at 503. Again citing Hughey, we overturned the award of restitution with regard to $1,922 that stemmed from "expenses related to lost property and document replacement," i.e., pocketbooks, wallets, and other items Blake took when he stole the cards, reasoning that the district court was required to look at the "specific conduct that is the basis of the conviction." Id. at 502, 506. We explained,

> For a person to be considered a victim under § 3663, the act that harms the individual must be either conduct underlying an element of the offense of conviction, or an act taken in furtherance of a scheme, conspiracy, or pattern of criminal activity that is specifically included as an element of the offense of conviction. But, if the harm to the person does not result from conduct underlying an element of the offense of conviction, or conduct that is part of a pattern of criminal activity that is an element of the offense of conviction, the district court may not

21

order the defendant to pay restitution to that individual.

Id. at 506 (citations omitted). We then explained that the elements of the crime to which Blake pled guilty (using the stolen credit cards) did not "include the theft of the credit cards," and thus, "the loss to the robbery victims was not caused by Blake's offense of conviction." Id. at 506-07 (emphasis supplied).

More recently, we held that a homeowner could not collect restitution under the VWPA where the defendant broke into a home and stole a firearm, but pled guilty only to possession of a stolen firearm. See United States v. Davis, 714 F.3d 809, 816 (4th Cir. 2013). The homeowner requested restitution of $500 for his insurance deductible for the unrecovered stolen firearm, and $185 for damage caused when Davis broke the window to enter the residence. See id. at 812. The district court ordered Davis to pay $685 in restitution to the homeowner, but we reversed. Relying on Blake, we explained,

> Like Blake's credit card theft, Davis's burglary and theft of the firearm represent "necessary step[s] in the accomplishment of his objective," here, possession of a stolen firearm. But, like Blake, "the factual connection between" these "necessary step[s]" and Davis's offense of conviction "is legally irrelevant for the purpose of restitution."

Id. at 814 (quoting Blake, 81 F.3d at 506). Therefore, restitution was improper because the loss to the alleged victim

22

"was not caused by possession of a stolen firearm, the sole offense of conviction." Id. (internal quotation marks omitted).

### b.

In 2012, the court was presented with an award of restitution imposed as a condition of supervised release under 18 U.S.C. § 3583(d). See United States v. Oceanpro Indus., Inc., 674 F.3d 323, 330 (4th Cir. 2012).

Oceanpro Industries, Inc. ("Oceanpro") was a seafood wholesaler business operating in Maryland and Virginia. See Oceanpro, 674 F.3d at 327. Oceanpro and two of its buyers were convicted of purchasing untagged and oversized striped bass and giving a false statement to law enforcement officers during the investigation related to the same. See id. The district court ordered Oceanpro and two of its fish buyers to, inter alia, pay $300,000 in restitution, jointly and severally, to Maryland and Virginia. See id. Oceanpro's restitution was made a condition of probation, and the fish buyers' restitution was made a condition of supervised release. All three appealed the restitution order. See id.

This court recognized the "analysis for ordering restitution as a condition of probation and supervised release is similar" to that of the VWPA. See Oceanpro, 674 F.3d at 331. It noted that the VWPA "defines victim as a person 'directly and proximately harmed as a result of the commission of an offense

23

for which restitution may be ordered,'" but also recognized that § 3563(b)(2) "specifically indicates that the restitution to a 'victim of the offense' for purposes of [supervised release or] probation is 'not subject to the limitation of' the VWPA." Id. at 330-31 (quoting 18 U.S.C. § 3663(a)(2)) (emphasis in original). This fact "indicat[es] that the definition of 'victim' in this context is even broader than the definition of 'victim' under the VWPA." Id. (emphasis in original).

But the court did not say how much broader, nor did it need to. Indeed, the court concluded that under the VWPA, the MVRA, and as a condition of supervised release/probation, "the district court was authorized to require the defendants to make restitution to the 'victims.'" Oceanpro, 674 F.3d at 332 (emphasis in original). It went on to declare Virginia and Maryland "merely had to have interests that were 'harmed' as a result of the defendants' criminal conduct," and because the states had "a legitimate and substantial interest in protecting the fish in their waters as part of the natural resources of the State[s] and [their] fishing industries," "their interests were indeed harmed," and restitution was appropriate. Id. at 331-32.

24

c.

In light of this precedent, we conclude the Government utterly failed to provide any evidence that the losses sustained by the purported victims here were caused by the specific conduct underlying Appellant's offense of conviction -- obstruction of federal bankruptcy proceedings. The Government simply states generally,

> Each victim suffered significant losses as a result of Freeman's causing him or her to purchase expensive assets under the mistaken belief that Freeman would pay for the assets, when in fact Freeman, by virtue of his obstruction, failed ever to repay these individuals (and sought, through his obstruction, to eliminate any legal obligation that he be required to do so).

Appellee's Br. 16. Further, the Government argues, "due to Freeman's obstruction, when the debts these victims incurred on the defendant's behalf came due, each individual was prevented from collecting against the defendant, or from pointing creditors to the defendant as the real party in interest." Id.

But these arguments suggest no more than a tangential connection between the purported victims' losses and the specific conduct underlying Appellant's obstruction conviction. Per a plain reading of the relevant statutes, and following the lead of Hughey, Davis, Blake and Broughton-Jones, we look to the elements of the offense of conviction and the "'specific conduct underlying these elements.'" Davis, 714 F.3d at 814 (quoting

25

Blake, 81 F.3d at 507). As delineated in the plea agreement, the elements of obstruction are "(1) the defendant corruptly attempted to and did obstruct, influence and impede an official proceeding, in this case a bankruptcy proceeding; (2) the defendant knew or should have known that the bankruptcy proceeding was pending; and (3) the official proceeding, was a federal proceeding." J.A. 23; see also 18 U.S.C. § 1512(c)(2).

The "specific conduct" that serves as the basis for these elements clearly did not cause the purported victim's losses. See Hughey, 495 U.S. at 413. As set forth in the Statement of Facts, the specific conduct relevant to this appeal is that Appellant falsely reported that he had no real property in which he had any "legal, equitable or future interest," no "personal property of whatever kind, including property being held for [Appellant] by someone else," and no "property owned by another that [Appellant] held or controlled." J.A. 31–32. The Government has failed to show that, even had Appellant been completely truthful about these matters, the purported victims would not have suffered the same harm. Cf. United States v. Messner, 107 F.3d 1448, 1455 (10th Cir. 1997) ("Because the same treatment would have resulted had Mr. Messner initially disclosed his ownership of the assets, it is not evident creditors were actually harmed by Mr. Messner's initial attempt to defraud them."). It is unclear how Appellant's

26

untruthfulness in the bankruptcy proceedings caused certain of the purported victims to sell their homes and another to resign from his job. We decline to make the leap the Government's theory requires based on no more than speculation.

Rather, it is quite obvious that the harm that befell the purported victims stemmed from Appellant's scheme of inducing church members to incur substantial debts in the name of the church, conduct for which Appellant was neither charged nor convicted. Indeed, the court's own words demonstrate the attenuated relationship between the conduct underlying the offense of conviction and the purported victims' losses. See J.A. 209 ("It was lying about [the debts of the church members on Appellant's behalf] to the Bankruptcy Court that produced the offense of conviction, but under no circumstances do I consider that it would not be appropriate to order restitution when there have been victims of the very things about which this defendant lied to this court."); see also id. at 205 ("[T]he offense of conviction is one committed . . . against . . . the Bankruptcy Court."). Appellant's untruthfulness during his bankruptcy proceedings may have exacerbated the purported victims' harm, but it certainly did not cause it, as required under our precedent.

Finally, we address the Government's reliance on Oceanpro. It argues that if the definition of "victim" is meant to be "broader" for purposes of supervised release than it is for the purposes of the VWPA and MVRA, Oceanpro, 674 F.3d at 331, then the purported victims in this case must fall into that broader definition. We disagree.

First, in Oceanpro, the court decided that Maryland and Virginia were "victims" under the VWPA, the MVRA, and 18 U.S.C. §§ 3563(b) and 3583(d). Thus, the statement that the term "victim" is "broader" under the supervised release statute versus the VWPA or MVRA is dicta. See The Pittston Co. v. United States, 199 F.3d 694, 703 (4th Cir. 1999) (defining dicta as "statement[s] in a judicial opinion that could have been deleted without seriously impairing the analytical foundation of the holding -- that, being peripheral, may not have received the full and careful consideration of the court that uttered it.") (internal quotation marks and citations omitted)); Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) ("[D]icta is not binding on anyone for any purpose.").

Furthermore, Oceanpro, in stating that the definition of victim is broader in a supervised release context, cites Batson. See Oceanpro, 674 F.3d at 331 (quoting Batson, 608 F.3d at 636). However, Batson, as explained above, ultimately holds

28

that regardless of which statute is used, "restitution is authorized for the offense of conviction and not for other related offenses of which the defendant was not convicted." 608 F.3d at 636.

Additionally, the language in Oceanpro, which states the victims "merely had to have interests that were 'harmed' as a result of the defendants' criminal conduct," must be read in the specific context of that case. 674 F.3d at 332. In Oceanpro, the defendants were convicted, inter alia, of conspiracy to violate the Lacey Act, 18 U.S.C. § 317. See Oceanpro, 674 F.3d at 327. Congress has specifically expanded the VWPA definition of victim in such cases: "the term 'victim' means . . . in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2) (emphasis supplied). Here, Appellant did not plead guilty to a crime involving a conspiracy, scheme, or pattern as an element. This court recognized, and it still remains good law, that the VWPA's expansion of the definition of victim in such cases "does not authorize a district court to order restitution to all individuals harmed by a defendant's criminal conduct." Blake, 81 F.3d at 506. Furthermore, unlike here, in Oceanpro it is clear the interests of Maryland and Virginia were

29

directly harmed by the illegal purchasing untagged and oversized fish swimming in the states' waters, as required by the VWPA.

Therefore, the Government's argument that, under Oceanpro, a "broader" reading of "victim" under §§ 3563(b) and 3583(d) would necessarily encompass the purported victims falls flat.

We thus have no trouble concluding the district court abused its discretion in awarding restitution to the purported victims, as the award was contrary to the legal principles set forth in Hughey, Davis, Broughton-Jones, and Blake. See Teleguz v. Pearson, 689 F.3d 322, 327 (4th Cir. 2012) ("When a court bases its decision on an error of law, it necessarily abuses its discretion.").

IV.

Therefore, we reverse the district court's judgment to the extent it orders restitution. Given that the district court ordered restitution in lieu of a fine, see J.A. 209 ("Accordingly, . . . in lieu of a fine, I'm going to enter an order of restitution to the victims . . ."), we remand this matter so that the court may consider whether or not to impose a fine. Cf. Batson, 608 F.3d at 636 ("There is no indication that the amount of the fine was conditioned on the amount of restitution, and we decline to reopen the matter.").

REVERSED AND REMANDED

30